# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 26, 2018          Decided June 8, 2018

No. 17-7100

RACHEL DEVORA SPRECHER FRAENKEL, INDIVIDUALLY, AS
PERSONAL REPRESENTATIVE OF THE ESTATE OF YAAKOV
NAFTALI FRAENKEL, AND AS THE NATURAL GUARDIAN OF
PLAINTIFFS A.H.H.F., A.L.F., N.E.F., AND S.R.F., ET AL.,
APPELLANTS

v.

ISLAMIC REPUBLIC OF IRAN, MINISTRY OF FOREIGN AFFAIRS,
ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01080)

*Robert J. Tolchin* argued the cause for appellants. With
him on the briefs was *Meir Katz. Rachel E. Weiser* entered an
appearance.

*Harry Phillips*, Student Counsel, argued the cause as
*amicus curiae* to present arguments in support of portions of
the District Court's orders at issue on appeal. With him on the
brief were *Erica J. Hashimoto*, appointed by the court, and
*Joseph Flanagan* and *Vetone Ivezaj*, Student Counsel.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: On June 12, 2014, sixteen-year-old Yaakov Naftali Fraenkel ("Naftali") and two of his classmates were taken hostage by members of Hamas while on their way home from school in Israel's West Bank. A half-hour after they were taken hostage, the boys were killed by their captors. Naftali's family brought suit in District Court against the Islamic Republic of Iran, Ministry of Foreign Affairs ("Iran"), the Iranian Ministry of Information and Security, and the Syrian Arab Republic ("Syria") (collectively, "Appellees") under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for providing material support to Hamas. The defendants failed to respond to the complaint and the District Court entered a default judgment in favor of the Fraenkels, awarding Naftali's estate $1 million for his pain and suffering and $50 million in punitive damages, and his family $4.1 million in solatium damages. *See Fraenkel v. Islamic Republic of Iran* (*Fraenkel I*), 248 F. Supp. 3d 21, 43 (D.D.C. 2017). This appeal concerns a challenge by the Fraenkels to the amount of damages awarded them.

The Fraenkels argue that the District Court erred in failing to determine the solatium damages awards in conformity with the remedial scheme established in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). We reject this claim. The decision in *Heiser* may serve as a useful reference point, but it is not binding precedent. District Court judges have discretion under 28 U.S.C. § 1608(e) to grant solatium awards based on the particular facts of each case,

subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning. *See Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).

The Fraenkels also contend that the District Court erred in awarding solatium damages in amounts less than the damages awarded in *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008). In justifying its decision, the District Court explained that, unlike the victims in *Gates* – American contractors servicing the U.S. military during the Iraq War – Naftali was not targeted for being an American. Although Naftali was a U.S. citizen, the District Court found that he was captured and killed because he was Jewish-Israeli. The District Court also found that the location of the Fraenkels' home, Naftali's school, and the site of the abduction indicated that Naftali and his family had "accepted the risk" of terrorist attacks. Based on these considerations, the District Court awarded solatium damages to Naftali's family members that were lower than the amounts awarded to the plaintiffs in *Gates*.

The Fraenkels claim that the District Court abused its discretion in awarding solatium damages because the court's judgment was based on impermissible considerations and clearly erroneous findings of fact. We agree.

For the reasons explained below, we reverse the District Court's judgment on the solatium damages awards and remand for further consideration. We affirm the District Court's punitive damages and pain-and-suffering awards because the judgments with respect to those awards were consistent with the applicable law, adequately reasoned, and supported by the evidence.

## I.     BACKGROUND

### A. Factual Background

Yaakov Naftali Fraenkel, a sixteen-year-old with Israeli and U.S. citizenship, attended boarding school in the Gush Etzion region of Israel's West Bank. His mother, father, and six siblings lived in Nof Ayalon, an Israeli settlement that straddles the Green Line. On the evening of June 12, 2014, Naftali headed home from school accompanied by two classmates, Gilad Shaer and Eyal Yifrach. The boys waited at a junction in Alon Shvut to hail a ride from passing cars. According to Naftali's mother, Rachelle Fraenkel, "[t]he boys thought they were getting a ride home in a spot where hitchhiking is very normal and usually safe." Declaration of Plaintiff Rachelle Fraenkel, at 8 ¶ 43 (June 27, 2016), *reprinted at* Appendix ("App.") 107.

Around 10:00 p.m., a car stopped for the young men. Inside were two members of Hamas, who abducted the boys at gunpoint. Around 10:30 p.m., Israeli emergency services received a telephone call. The police heard a voice that sounded like Gilad, who said that the boys had been kidnapped; they also heard another voice speaking in Arabic and Hebrew saying "put your head down." The police then heard muffled sounds of gunshots and a person moaning in physical pain. It was later determined that the terrorists had shot and killed each boy. After eighteen days of searching, the boys' bodies were found on land owned by the head of a Hamas cell. On August 20, 2014, Hamas officially took responsibility for the kidnapping and murders of Naftali, Gilad, and Eyal.

On July 9, 2015, the Fraenkels brought this civil action in District Court, alleging that Iran, the Iranian Ministry of

Information and Security, and Syria materially supported Hamas in connection with Naftali's kidnapping and murder.

## B. The Statutory Framework

Foreign states are immune from the jurisdiction of federal courts, subject to certain exceptions codified in the Foreign Sovereign Immunities Act of 1976 ("FSIA"). 28 U.S.C. § 1604; *see Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989) ("[T]he FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in federal court."). The Fraenkels' action relies upon one such provision in the FSIA, known as the "terrorism exception" to sovereign immunity. *See* 28 U.S.C. § 1605A.

It is well understood that, over the years, Congress has amended the FSIA to allow "massive judgments of civil liability against nations that sponsor terrorism." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 571 (7th Cir. 2012); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 763–65 (D.C. Cir. 2017). These legislative actions obviously have aimed to deter state-sponsored terrorism. Consistent with this legislative goal, § 1605A provides federal courts with jurisdiction over, and withdraws sovereign immunity from, suits

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

Section 1605A also creates a federal cause of action directly against foreign governments. Under § 1605A(c), "national[s] of the United States" may sue certain foreign governments – those designated by the U.S. government as state sponsors of terrorism – for the acts described in § 1605A(a)(1) causing "personal injury or death." *Id.* § 1605A(c). The statute specifies that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages." *Id.*

In order to obtain a default judgment in a § 1605A action, plaintiffs must "establish[] [their] claim or right to relief by evidence satisfactory to the court." *Id.* § 1608(e). Upon obtaining a default judgment, successful plaintiffs may recover damages by proving "that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Hill*, 328 F.3d at 684. Although these requirements "give an unresponsive sovereign some protection against an unfounded default judgment," plaintiffs need not submit "more or different evidence than [a court] would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens*, 864 F.3d at 785.

The courts are not authorized to craft a body of federal common law in deciding FSIA terrorism exception claims. *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). However, a district court may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c). *See id.*

Finally, foreign national family members of an American victim, who do not have a cause of action under § 1605A(c), "may continue to pursue claims under applicable . . . foreign law." *Leibovitch*, 697 F.3d at 572. "Although § 1605A created a new cause of action, it did not displace a [foreign national] claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity." *Id.*; *see also Owens*, 864 F.3d at 809.

## C. The Litigation in District Court

As noted above, the Fraenkels brought this action against Appellees in the District Court pursuant to the FSIA's terrorism exception, 28 U.S.C. § 1605A. Their complaint alleged that Appellees provided material support and resources to Hamas in furtherance of the hostage taking and murder of Naftali. Although the Fraenkels properly served Appellees with process under 28 U.S.C. § 1608(a), none of the defendants filed an answer or otherwise appeared. Accordingly, the Fraenkels filed a motion for default judgment.

### 1. *Fraenkel I*

On March 31, 2017, following a two-day evidentiary hearing on liability and damages, the District Court entered a default judgment in favor of the Fraenkels and against Appellees. *See Fraenkel I*, 248 F. Supp. 3d at 43. The District Court first explained that the Fraenkels had satisfactorily proved each requirement for jurisdiction and waiver of sovereign immunity under § 1605A(a). *See id.* at 35. Regarding Appellees' liability, the District Court determined that Rachelle Fraenkel and her six surviving children had satisfactorily proved their claims against Appellees under § 1605A(c)'s right of action. *See id.* at 35–38.

Abraham, Naftali's father, lacks a private right of action under § 1605A(c) because he is not a U.S. national. Nonetheless, the District Court concluded that it had jurisdiction over Abraham's complaint pursuant to § 1605A(a)(1) and that foreign sovereign immunity was waived pursuant to § 1605A(a)(2)(A)(ii)(I). Thus, the District Court determined that it could consider Abraham's Israeli law tort claims. *See Owens*, 864 F.3d at 809 (allowing foreign family members of U.S. nationals to bring claims under alternative sources of law once sovereign immunity is waived under § 1605A(a)). The District Court first applied District of Columbia choice-of-law rules and concluded that Israeli law governed Abraham's tort claims. *See Fraenkel I*, 248 F. Supp. 3d at 38–39. After finding that Abraham had "established negligence by Iran and Syria under Israeli law," the District Court entered judgment on his behalf. *Id.* at 40.

The only dispute now before this court concerns the District Court's damages awards to the plaintiffs. The U.S. national plaintiffs received damages pursuant to § 1605A(c), which authorizes "economic damages, solatium, pain and suffering, and punitive damages." The District Court awarded Naftali's estate $1 million for his pain and suffering, because "it is clear from the evidence Naftali Fraenkel suffered from the moment he was taken hostage up until his death," a span of about 30 minutes. *Fraenkel I*, 248 F. Supp. 3d at 40–41.

Naftali's mother and siblings also received solatium damages, which is compensation for loss of society and for emotional suffering or grief caused by the death of a family member. The District Court found that

> [t]he Fraenkel family is obviously very close. Each member testified in detail about Naftali's role in the

> family (second oldest and second son) and what he meant in their lives specifically. The testimony provided a picture of a loving family, wherein Naftali played a central role in their spiritual and personal lives. Multiple family members testified about Naftali's musical ability and how it enriched their celebrations on the Sabbath and other holy days. Without question, the lives of each member of the family will be forever altered because Naftali is not with them.

*Fraenkel I*, 248 F. Supp. 3d at 41. Finding "the evidence of the Plaintiffs' entitlement to solatium compensation fully satisfactory," the District Court awarded Rachelle and her children $3.1 million in solatium damages. *Id.*

The District Court further determined that punitive damages were warranted based on "the character of the defendants' act, . . . the nature and extent of harm to the plaintiffs[,] . . . the need for deterrence, and . . . the wealth of the defendants." *Id.* Based on these considerations, the District Court awarded the U.S. national Fraenkels $50 million in punitive damages jointly and severally against Iran and Syria. *Id.*

The District Court awarded Abraham Fraenkel compensatory damages under Israeli law. *Id.* at 42–43. Taking into account not only the pain that Naftali's death caused his father, but also the physical and emotional effects the loss has had on Abraham's daily life, the court awarded Abraham $1 million in solatium damages. *Id.* at 43.

### 2. *Fraenkel II*

The Fraenkels moved to reconsider the District Court's damages awards, taking particular issue with the amount of solatium damages awarded. They argued that the damages were insufficient to provide them fair compensation and that the awards departed from the remedial scheme established in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). In *Heiser*, the District Court reviewed prior FSIA decisions and summarized the typical amounts awarded for solatium based on the nature of the relationship between the victim and his or her family members. *See id.* at 268–70. The Fraenkels argued that the *Heiser* amounts are baselines that should guide all other District Court judges in their awards of solatium damages.

On June 28, 2017, the District Court denied the motion for reconsideration. *Fraenkel v. Islamic Republic of Iran* (*"Fraenkel II"*), 258 F. Supp. 3d 77 (D.D.C. 2017). It declined to conform its damages awards to the amounts specified in *Heiser*, noting that "*Heiser* is not binding; it is an opinion of a valued colleague, not a superior court." *Id.* at 82. The District Court thus refused to rely on *Heiser*'s solatium amounts as a baseline. Instead, the court held that the FSIA "require[s] all . . . plaintiffs to justify their damages, which means that damages must be reasonably tied to a plaintiff's facts." *Id.*

The District Court then elaborated on the reasoning behind the original amounts of damages awarded. The court made it clear that, in its view, the Fraenkels deserved damages awards below the amounts awarded to the plaintiffs in *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008). *See Fraenkel II*, 258 F. Supp. 3d at 82. In reaching this conclusion, the District Court rested on two principal points.

First, the court found it significant that the victims in *Gates* were abducted and brutally beheaded "because they were U.S. citizens living abroad engaged in work at the behest of the United States government." *Id.* at 83. In contrast, the court explained, the Fraenkels "are all natives of Israel." *Id.* The court reasoned that "Naftali was not targeted because he was a U.S. citizen, and he was not a U.S. citizen inadvertently caught up in the Israeli-Palestinian conflict . . . . To the contrary, Naftali Fraenkel was an Hamas target because of his Israeli citizenship." *Id.* at 84.

Second, in contrast to its initial decision, which stated that Naftali was kidnapped from Alon Shvut Junction, *see Fraenkel I*, 248 F. Supp. 3d at 27, the court said on reconsideration that he was kidnapped when hitchhiking home from Gush Etzion Junction, *see Fraenkel II*, 258 F. Supp. 3d at 83. The court noted that Appellants' own expert had identified Gush Etzion Junction as the "site of many terror attacks." *Id.* The District Court also stated in its decision on reconsideration that the Fraenkels had "accepted the risks of living in a community built across the Green Line in Israel and sending Naftali Fraenkel 40 miles further into the West Bank for high school." *Fraenkel II*, 258 F. Supp. 3d at 83.

The trial judge appeared to believe that the foregoing considerations and facts distinguished this case from *Gates*. Therefore, in the view of the District Court, this justified damages awards lower than those granted in *Gates*.

The Fraenkels appealed the denial of their motion for reconsideration. Because neither Iran nor Syria has entered an appearance in this litigation, the court appointed Georgetown University Law Center's Appellate Litigation Program as *amicus curiae* to present arguments in support of the District Court's judgment.

## II.   ANALYSIS

The issues on appeal are limited to the District Court's damages rulings. There is no doubt that the District Court had jurisdiction over the Fraenkels' claims pursuant to § 1605A(a) and that this Court has jurisdiction over this appeal under 28 U.S.C. § 1291. It is uncontested that the Fraenkels have raised proper causes of action – the U.S. Appellants under § 1605A(c), and Abraham under Israeli tort law – and Appellees' liability is also uncontested.

On appeal, the Fraenkels focus on three arguments. First, they claim that in setting the awards for solatium damages, the District Court relied on improper considerations and clearly erroneous factual findings. Second, the Fraenkels argue that the District Court misapplied *Gates*. And, finally, they contend that the District Court "broke from precedent" in failing to follow *Heiser*'s remedial scheme. We find merit in the first two contentions.

### A.   Standard of Review

We review the District Court's FSIA damages awards for abuse of discretion. *See Owens*, 864 F.3d at 785; *Hill*, 328 F.3d at 683. Abuse-of-discretion review of findings underlying a default judgment in a FSIA case of this sort is "lenient." *Owens*, 864 F.3d at 785. However, the District Court's authority to award damages under § 1605A(c) is not without limits. *See United States v. Taylor*, 487 U.S. 326, 336 (1988) ("[D]iscretionary choices are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles.").

"A district court would necessarily abuse its discretion if it based its ruling on" an error of law, "a clearly erroneous assessment of the evidence," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990), or an improper weighing of the factors limiting its discretion, *see, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 28 (2008); *Taylor*, 487 U.S. at 336. In assessing whether the District Court has abused its discretion, we must always "ensure that the purposes of the" statute granting discretion to the trial court – in this case, the FSIA – "are given effect." *Taylor*, 487 U.S. at 336.

## B.   The District Court's Judgment on Solatium Damages

In *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998), the first case decided against Iran under the terrorism exception to the FSIA, Judge Lamberth issued a seminal opinion explaining the origins and particulars of solatium damages. This opinion remains the best explanation of solatium damages in this circuit and it continues to guide dispositions of claims under the FSIA. *See, e.g.*, *Fraenkel I*, 248 F. Supp. 3d at 41; *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85–86 (D.D.C. 2010); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196–97 (D.D.C. 2003) (relying on *Flatow*)); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 52 (D.D.C. 2001).

As explained in *Flatow*, "[s]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society. It began as a remedy for the loss of a spouse or a parent. It has since expanded to include the loss of a child." 999 F. Supp. at 29. A claim may also be based on the loss of a sibling if the claimant "prove[s] a close emotional relationship with the decedent." *Id.* at 30. "[M]ental anguish,

bereavement and grief resulting from the fact of decedent's death constitutes the preponderant element of a claim for solatium." *Id.* "As damages for mental anguish are extremely fact-dependent, claims require careful analysis on a case-by-case basis." *Id*. Judge Lamberth further explained the following considerations that come into play in any judicial assessment of solatium damages:

> It is entirely possible to come to terms with the fact of death, and yet be unable to resolve the sense of anguish regarding the circumstances of death. This is particularly true where the death was sudden and violent. How the claimant learned of decedent's death, and whether there was an opportunity to say good-bye or view the body can be a significant factor contributing to the claimant's anguish. . . .

> The calculations for mental anguish and loss of society share some common considerations. First, the calculation should be based upon the anticipated duration of the injury. Claims for mental anguish belong to the claimants and should reflect anticipated persistence of mental anguish in excess of that which would have been experienced following decedent's natural death. When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time.

> The nature of the relationship between the claimant and the decedent is another critical factor in the solatium analysis. If the relationship is strong and close, the likelihood that the claimant will suffer mental anguish and loss of society is substantially increased, particularly for intangibles such as

companionship, love, affection, protection, and guidance. Numerous factors enter into this analysis, including: strong emotional ties between the claimant and the decedent; decedent's position in the family birth order relative to the claimant; the relative maturity or immaturity of the claimants; whether decedent habitually provided advice and solace to claimants; whether the claimant shared interests and pursuits with decedent; as well as decedent's achievements and plans for the future which would have affected claimants.

Finally, unlike lost wages, which can be calculated with a fair degree of mathematical certainty, solatium cannot be defined through models and variables. . . . This is the paradox of solatium; although no amount of money can alleviate the emotional impact of a child's or sibling's death, dollars are the only means available to do so.

*Id.* at 30–32 (citations omitted); *see also* Black's Law Dictionary 1607 (10th ed. 2014) (defining "solatium" as "[c]ompensation; . . . damages allowed for hurt feelings or grief, as distinguished from damages for physical injury"); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) (describing "a claim for solatium" as "nearly indistinguishable from a claim for" intentional infliction of emotional distress); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89–90 (D.D.C. 2002) (listing five factors, derived from *Flatow*, that district courts consider in calculating solatium damages).

There is no authority to which we have been cited or which we have been able to find that applies "assumption of risk" principles to limit solatium damages under the FSIA. As a

general matter, it is understood that "[a] plaintiff who voluntarily assumes a risk of harm arising from the negligent or reckless conduct of the defendant cannot recover for such harm." Restatement (Second) of Torts § 496A (1965). However, as we explain below, it would make no sense to hold that a family assumes the risk of having a son abducted on public property and then killed by terrorists if they knew that terrorists sometimes kidnapped innocent people in the area in which he was abducted. This is not the law.

With this understanding of solatium damages, we turn now to plaintiffs' challenges to the District Court's decision in this case. As noted above, we reverse and remand the District Court's judgment with respect to the § 1605A(c) solatium damages awards because the court's judgment was based on impermissible considerations and clearly erroneous findings of fact. We also reverse and remand Abraham's damages award for the same reasons as the § 1605A(c) solatium damages awards. Although Abraham's damages were calculated under Israeli law, we default to the application of federal law when there is a lack of information regarding the proper calculation of damages under foreign law, as there is here. *See, e.g.*, *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 47 (D.D.C. 2016). There are two problems with the District Court's judgment: (1) the court's reliance on the terrorists' intent to target Israelis as a justification for limiting solatium damages awarded to Naftali's survivors; and (2) the court's supposition that solatium damages should be limited because Naftali and his family assumed the risk that he might be abducted and killed by terrorists. These considerations are discussed in turn below.

### *1. Nationality of the Victim*

The District Court indicated that the Fraenkels should receive solatium damages awards below the amounts awarded to the plaintiffs in *Gates* because Naftali was targeted for being Israeli while the victims in *Gates* were targeted for being U.S. nationals. *Fraenkel II*, 258 F. Supp. 3d at 84. This rationale does not withstand scrutiny. We can find no legal basis under the FSIA for limiting a plaintiff's solatium damages award because the victim of an extrajudicial killing was targeted for his affiliation with Israel, rather than the U.S.

Section 1605A does not distinguish between U.S. national victims and dual-citizen victims in authorizing damages under its private right of action. *See* 28 U.S.C. § 1605A(c). Indeed, § 1605A does not even require that the victim of the terrorist attack be a U.S. national for his American relatives to recover for his death. *See id.* § 1605A(a)(2)(A)(ii) (requiring as a condition of waiving sovereign immunity and granting jurisdiction that "the claimant *or* the victim was" a U.S. national) (emphasis added); *id.* § 1605A(c)(1) (requiring the claimant, not the victim, to be a U.S. national in order to recover under the right of action). Under the statute, Naftali's national affiliation is irrelevant for the purposes of determining the U.S. plaintiffs' entitlement to damages under § 1605A(c). It is undisputed here that Naftali's mother and siblings are all U.S. nationals.

The reason that Naftali was targeted is likewise irrelevant for purposes of his father Abraham's Israeli law claims. Abrogation of sovereign immunity under § 1605A(a), on which the court's jurisdiction over his claims depends, requires that the victim is a U.S. national. But that provision contains no qualifier on whether the victim's U.S. citizenship was relevant to the act. Therefore, it does not matter under the FSIA that

Naftali was also an Israeli citizen and may have been targeted because of this.

Finally, the District Court's reasoning does not comport with its own interpretation of "solatium." As the court properly recognized, "solatium" damages are compensation for "[m]ental anguish, bereavement and grief resulting from the fact of decedent's death." *Fraenkel I*, 248 F. Supp. 3d at 41 (quoting *Flatow*, 999 F. Supp. at 30). The District Court found that Naftali's abduction and death caused his family severe emotional anguish and "will . . . forever alter[]" their lives. *Id.* There is certainly no basis in the record or in the District Court's reasoning to support a conclusion that the Fraenkels suffered less from Naftali's murder because they might have thought that he was killed for being Israeli, and not for being a U.S. citizen. Indeed, the District Court acknowledged that the fact that Naftali was murdered for being a Jewish-Israeli teenager "do[es] nothing to lessen the Plaintiffs' grief or loss or U.S. citizenship." *Fraenkel II*, 258 F. Supp. 3d at 84. By the District Court's own definition of "solatium" and its own factual findings, then, the terrorists' motivation in targeting Naftali was not a permissible basis for lowering the solatium awards granted to his family.

On remand, the District Court should apply the considerations outlined in *Flatow*, 999 F. Supp. at 30–32, without regard to Naftali's dual citizenship, to determine the appropriate amounts of solatium damages to award to the Fraenkels.

## 2. *Assumption of Risk*

The District Court also suggested that the Fraenkels should receive solatium damages awards below the amounts awarded to the plaintiffs in *Gates* because Naftali and his parents assumed the risk that he might be kidnapped and killed by terrorists. *See Fraenkel II*, 258 F. Supp. 3d at 83–84. On this point, the District Court noted that "[the Fraenkels] accepted the risks of living in a community built across the Green Line in Israel and sending Naftali Fraenkel 40 miles further into the West Bank for high school in Gush Etzion[, which] is about six miles from Hebron, a predominately Palestinian city." *Id*. The District Court obviously took these facts into account in assessing, and limiting, the solatium damages it awarded. We agree with the Fraenkels that the court erred in doing this.

Under common law theory, the doctrine of assumption of risk can be used to bar recovery for a negligent act when a plaintiff has voluntarily incurred a known risk. *See, e.g., Scoggins v. Jude*, 419 A.2d 999, 1004 (D.C. 1980). It is typically an affirmative defense and the burden of proof lies with the defendant. *Morrison v. MacNamara*, 407 A.2d 555, 566 (D.C. 1979). "[T]he princip[al] elements of the defense are an actual knowledge and comprehension of a danger caused by the defendant's negligence and the plaintiff's voluntary exposure to that known danger." *Id*. at 567.

We can find no authority in which assumption of risk has been held to be a defense against an otherwise viable claim under the FSIA, or that has indicated it should result in a reduced damages award. The reason is simple: assumption of risk is not a defense when a plaintiff (or a victim under the FSIA) "is compelled to accept the risk in order to exercise or protect a right or privilege, of which the defendant has no privilege to deprive him." *Kanelos v. Kettler*, 406 F.2d 951,

955 (D.C. Cir. 1968). "[A]cceptance of the risk is not to be regarded as voluntary where the defendant's tortious [or unlawful] conduct has forced upon [a party] a choice of two courses of conduct, which leaves him no reasonable alternative to taking his chances." *Id.* (quoting Restatement (Second) of Torts 469 E, comment *c* (1965)). Further, one does not assume the risk that he will be the victim of an intentional tort. *See Janelsins v. Button*, 648 A.2d 1039, 1045 (Md. 1994) (noting that "jurisdictions that have considered the issue of assumption of risk as a defense to an intentional tort have overwhelmingly rejected its applicability" and citing cases).

Thus, the driver who voluntarily chooses to go out at night does not assume the risk of being hit by an inebriated motorist. *See Knight v. Jewett*, 834 P.2d 696, 704–05 (Cal. 1992). The college student who consumes alcohol at a party does not assume the risk of being sexually assaulted by another guest. *See Doe v. Roe*, No. CV125034145S, 2013 WL 6912882 (Conn. Super. Ct. Nov. 27, 2013). The employee who enters a hostile crowd of customers does not assume the risk that one of them will physically batter him. *See Blankinship v. Duarte*, 669 P.2d 994, 999 (Ariz. 1983). And we add that the family of a boy hailing a ride home from school on a public street and engaging in no unlawful conduct does not assume the risk of the boy being kidnapped and killed by terrorists. The District Court's suggestion to the contrary was error.

Furthermore, the District Court's finding that, when they were kidnapped, Naftali and his friends were "hitchhiking home at 10:30 at night from Gush Etzion Junction," *Fraenkel II*, 258 F. Supp. 3d at 83 – an area it suggested had experienced "many terror attacks," *id.* – is not supported by the record. One expert report in the record did indeed mistakenly identify the site of the kidnapping as the Gush Etzion Junction. *See* Declaration of Arieh Dan Spitzen at 6 ¶ 20 (June 23, 2016),

*reprinted at* App. 40, 45. But the expert later issued a supplemental report and offered live testimony correcting that earlier statement and clarifying that Naftali was kidnapped from the Alon Shvut Junction, more than three kilometers from the Gush Etzion Junction. Transcript of Evidentiary Hearing at 114, 123–24 (Dec. 6, 2016), Plaintiff Witness Arieh D. Spitzen, App. 448, 457–58; Supplemental Declaration of Arieh Dan Spitzen at 1–2 ¶¶ 3–4 (Nov. 4, 2016), App. 641–42. Indeed, the District Court's first opinion states that Naftali had been kidnapped at "a junction in Alon Shvut," not at the Gush Etzion Junction. *Fraenkel I*, 248 F. Supp. 3d at 27.

Moreover, the District Court's own findings indicate that the Alon Shvut Junction was not unduly dangerous. *See id.* ("It was common for students and other individuals to wait for rides at that junction."); *Fraenkel II*, 258 F. Supp. 3d at 84 (crediting Rachelle Fraenkel's testimony that "the boys thought they were getting a ride home in a spot where hitchhiking is very normal and usually safe"). Therefore, even if assumption of risk were relevant, the District Court erred in concluding that Naftali assumed a heightened risk of a terrorist attack based on the history of the junction from which he was kidnapped. And, importantly, the District Court failed to explain how the risks associated with living in the Fraenkels' community impacted their "[m]ental anguish, bereavement, and grief." *Flatow*, 999 F. Supp. at 30.

Finally, it should be noted that Congress clearly intended the FSIA's terrorism exception to deter states from supporting terrorism in areas of the world like the area in which Naftali lived and was killed. *See Leibovitch*, 697 F.3d at 565. Only five months after the original terrorism exception was enacted, Congress passed the Flatow Amendment in order to expand the remedies available to victims of state-sponsored terrorism. *See* 28 U.S.C. § 1605 (note). "[O]ne of the prime movers behind"

the amendment was Stephen Flatow, whose daughter, Alisa Flatow, was killed by a suicide bomber in Gaza – a territory abutting Israel that, like the West Bank, is fraught with longstanding political tension and a history of terrorism. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 43 (D.D.C. 2009); *Flatow*, 999 F. Supp. at 7. When families like the Flatows were unable to recover punitive damages under the FSIA against Iran, *see Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1027 (D.C. Cir. 2004), Congress replaced the prior terrorism exception with § 1605A in order to expand the relief available, *Leibovitch*, 697 F.3d at 567.

Given Congress's consistent expansion of remedies under the FSIA for victims of state-sponsored terrorism overseas, in areas of the world subject to high levels of terrorism, it is hard to imagine that Congress meant for district courts to reduce solatium awards under § 1605A(c) for families like the Fraenkels who live in areas that may face an increased incidence of terrorist attacks. We therefore reverse and remand the District Court's judgment on the solatium damages awards so that the court may reassess these damages without any suggestion that Naftali and his immediate family "accepted the risk" that he might be kidnapped and killed by terrorists.

### *3. The Fraenkels' Reliance on* Heiser

The Fraenkels additionally argue that the District Court "broke from precedent," supported by "extensive case law on damages in [FSIA] cases," by awarding solatium damages in amounts "dramatically lower than those received by thousands of similarly-situated plaintiffs." Appellants' Br. 29. According to the Fraenkels, this "case law" governing solatium awards is authoritatively summarized in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). In that

case, the District Court reviewed prior FSIA decisions and concluded that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." *Id.* at 269. The Fraenkels maintain that subsequent District Court decisions have invariably followed the *Heiser* framework, and that as a result, the court below was obligated to consider these amounts a "baseline" from which they could vary only with reasoned justification. We disagree.

We recognize that many FSIA decisions issued by the District Court follow *Heiser*'s solatium damages model. *See, e.g.*, *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 42–44 (D.D.C. 2012). However, the District Court in this case was not *required* to follow *Heiser* for the simple reason that *Heiser* is not controlling precedent. *See Labow v. U.S. Dep't of Justice*, 831 F.3d 523, 532 (D.C. Cir. 2016) ("[D]istrict court opinions do not establish binding precedent on other courts . . . .").

We decline to impose *Heiser*'s framework as a mandatory scheme under the FSIA. First, the FSIA, and the case law applying the statute, make it clear that the trial judge has discretion in determining solatium damages. The FSIA requires only that a plaintiff "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Hill*, 328 F.3d at 684 (requiring plaintiffs to prove the amount of economic damages "by a reasonable estimate"). Given this statutory scheme, District Court judges invariably must exercise discretion in determining damages awards under the FSIA. There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted.

*Heiser* reflects a reasonable effort to chart solatium award baselines, but the figures merely reflect the summary of judgments in prior cases – many of which, like this case, were not the product of contested litigation. While past solatium awards from comparable cases are appropriate sources of guidance for district courts, "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." *Fraenkel II*, 258 F. Supp. 3d at 82.

Indeed, not all District Court decisions awarding solatium damages to family members of a decedent have applied the *Heiser* framework. *See Estate of Bayani v. Islamic Republic of Iran*, 530 F. Supp. 2d 40, 46 (D.D.C. 2007) (involving solatium higher than *Heiser* amounts for victim tortured for two years by Iranian government before being executed, causing his family acute suffering); *see also Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015); *Gates*, 580 F. Supp. 2d at 71–72.

As explained above, we are obliged to leave it to the wise discretion of our judicial colleagues on the District Court to determine the damages that are due under the FSIA. And, as we have explained, the District Court does not abuse its discretion unless it issues a judgment based on an error of law, "a clearly erroneous assessment of the evidence," *Cooter & Gell*, 496 U.S. at 405, or an improper weighing of the factors limiting its discretion, *see, e.g.*, *Winter*, 555 U.S. at 28.

## C.   Pain-and-Suffering and Punitive Damages

Finally, the Fraenkels have objected, albeit in a relatively cursory fashion, to the pain-and-suffering and punitive damages amounts awarded by the District Court. Appellants' Br. 52–54. We have fully considered the Fraenkels' objections

to these awards and we find no merit in them. The District Court's findings with respect to these awards were consistent with the requirements of the law, reasonable, supported by adequate explanation, and fully within the bounds of its discretion.

### III. CONCLUSION

For the foregoing reasons, we reverse the District Court's judgment on solatium damages awards and remand for further consideration consistent with this opinion. We affirm the District Court's pain-and-suffering and punitive damages awards.